IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COGMEDIA LLC, | § | |
| | § | |
| Plaintiff | § | CASE NO. 1:25-cv-12127 |
| | § | |
| vs. | § | **JURY TRIAL DEMANDED** |
| | § | |
| META PLATFORMS, INC., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff COGMEDIA LLC files this Original Complaint for Patent Infringement against Defendant META PLATFORMS, INC. alleging as follows:

**I. THE PARTIES**

1.     COGMEDIA LLC, ("Plaintiff" or "Cogmedia") is a Limited Liability Company with a principal place of business in the Boston metro area c/o Sunstein LLP 100 High Street, 20th Floor, Boston, MA 02110.

2.     Defendant META PLATFORMS, INC. ("Defendant" or "Meta") is a company organized and existing under the laws of the State of Delaware with a principal place of business located at 1 Meta Way, Menlo Park, CA 94025.  Meta was formerly known as Facebook, Inc. and Thefacebook.com LLC. Meta may be served with process by serving its registered agent, Corporation Service Company, 84 State Street, Boston, MA 02109.

3.     Meta has directly and/or indirectly used, developed, designed, manufactured, distributed, marketed, offered to sell and/or sold infringing products and services in the United States, including in the District of Massachusetts, and otherwise performed, practiced and/or directed infringing activities in this District in connection with their products and services.  Such

activities have infringed Plaintiff's patented claims directed towards improved computer-implemented methods as set forth in further detail herein.

## II. JURISDICTION AND VENUE

4.      This is an action for infringement of United States patents under 35 U.S.C. §§ 271, *et seq.,* including without limitation 35 U.S.C. §§ 271, 281, 284, and 285.    This is a patent infringement lawsuit over which this Court has subject matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331, 1332, and/or 1338.

5.      This United States District Court for the District of Massachusetts has general and specific personal jurisdiction over Defendant because Defendant, directly and/or through intermediaries, has committed acts within the District giving rise to this action, and is present in and transacts and conducts business in and with residents of this District.

6.      Personal jurisdiction exists over Defendant because Defendant has minimum contacts with this forum as a result of business regularly conducted within the Commonwealth of Massachusetts and within this District, and, on information and belief, specifically as a result of, at least, committing the tort of patent infringement within Massachusetts and this District.

7.      Defendant is further subject to personal jurisdiction in this Court because, *inter alia*, Defendant regularly solicits and transacts business in this District and has an established place of business in this District. Accordingly, this Court's jurisdiction over Defendant comports with the constitutional standards of fair play and substantial justice and arises directly from Defendant's purposeful minimum contacts with the Commonwealth of Massachusetts.

8.    For example, Meta currently maintains or has maintained a presence at its "Boston office", as evidenced by its publicly available website that details the operation of said office:[1]





---

[1] See,
https://www.metacareers.com/v2/locations/boston/?p[offices][0]=Boston%2C%20MA&offices[0]=Boston%2C%20MA



9.      On information and belief, Defendant's employees work in this District in at least the following roles and responsibilities: Software Engineer, Staff Engineer, Machine Learning Engineer, Android Developer, Creative Technical Leader, QA Lead.  Defendant's employees in these roles work, at least in part, on Meta products or in subject matters related to the Meta products that are relevant to the claims or defenses in this action. The following "teams in Boston" are listed on Defendant's public website:[2]

---

[2] *Id.*









10.     By way of example, "Laney Z., Software Engineer", works in Meta's offices in this District. Defendant's website includes testimonials of "our team" that work in Boston:[3]



11.     On information and belief, there are key witnesses who work in other divisions of Meta, including those who perform finance and marketing functions, that are located in this

---

[3] *Id.*

District and will be called as witnesses for purposes of quantifying and substantiating damages in this case.

12.    On information and belief there are relevant documents accessible by Defendant through its office in this District. For example, servers and/or data centers accessible by Defendant in its offices in this District include software code relevant to the claims or defenses at issue in this action.

13.    Meta, including when doing business under the name Facebook, Inc., has previously not contested proper venue in this District. *See, e.g.*, *Neural Magic, Inc. v. Facebook, Inc. and Aleksandar Zlateski*, Civil Action No. 1:20-cv-10444-DJC (D. Mass.) ("Facebook admits that it maintains an office in Cambridge, Massachusetts, transacts business in Massachusetts, has an interest in using or possessing real property in Massachusetts, and contracts to supply services or things in Massachusetts.").

14.    Venue is proper in Boston because infringement of the claimed computer implemented methods occurs in Boston, under at least the following two scenarios: 1) Facebook mobile application use; and 2) Facebook access through a web browser via a computer and/or laptop.

15.    As will be explained further below, in the context of end users (including Defendant's employees) using a mobile phone or tablet device to access Facebook/Meta, Defendant's software resident on the user's device works in concert with Defendant's backend network to practice the limitations of the Asserted Claims. This resident software is found within the Facebook application which has previously been downloaded to the user device. The user device executes aspects of the application software in response to input from end users, which cause it to communicate to Defendant's backend servers. In this environment, and as will be

discussed further below, at least claim limitations for extracting data comprising an image, heading, and/or hyperlink for a shared article may be performed locally by software on the user's device, which is then communicated to Defendant's backend servers. Likewise, the claimed "displaying a representation" may also be performed on the user's device through the execution of the local application software. The backend server network operates to store variable data for use by the application software to cause display of the representation. Because the Asserted Claims are drawn to methods, and because each step in the method occurs through execution of Defendant's software (whether on the device or on the backend) within this District, Defendant directly infringes in this venue.

16.    In the context of the second scenario of infringement, wherein end users (including Defendant's employees) are accessing Facebook using a web browser, the processing steps claimed are performed by the Facebook backend to configure and cause display of representations. No resident Facebook software exists on the computer or within the browser application. Therefore, Facebook backend does all of the processing and simply communicates the results to the browser application for display. All of these activities are performed by Defendant within this District. Thus, Defendant directly infringes in this venue under either scenario.

17.    Accordingly, venue is proper in this District because Defendant maintains a regular place of business in Boston and infringement occurs in Boston by virtue of end user phones and tablets, in conjunction with Defendant's backend network, executing Facebook software in Massachusetts to perform the limitations of the asserted claims. For end users that utilize a computer, server components comprising Facebook's backend network reside at its Boston office location. These, upon information and belief, operate as edge servers (or cache servers) to the Facebook core backend network to service user requests from end users near Boston. Further,

Facebook engineers at its Boston campus write code used to operate Facebook and perform in-house testing of it before releasing software updates.

18.    For the reasons set forth herein, personal jurisdiction exists and venue is proper against Defendant in this District pursuant to 28 U.S.C. § 1391 and/or 28 U.S.C. § 1400(b).

### III. BACKGROUND FACTS

19.    Plaintiff is the owner of United States Patent Nos. 11,036,371, 9,817,562, and 10,664,141 (collectively, "the Asserted Patents" or "the Patents-in-Suit"). By way of assignment, Plaintiff is the owner of all right, title, and interest, in and to the Patents-in-Suit, with all rights to enforce the patents against infringers and to collect damages, including past damages, for all relevant times, as well as the right to prosecute this action.

20.    Dr. Paul Keel, an inventor of the Patents-in-Suit, resides in this District at his residence in Cambridge, Massachusetts. Dr. Keel is an inventor with a lifelong passion to explore ways of communicating complex concepts and ideas more effectively.  Dr. Keel's background includes a Ph.D in Architectural Design and Computation from The Massachusetts Institute of Technology ("MIT") followed by over twenty years of consulting and research work relating to military intelligence processing.

21.    In approximately 1994, Dr. Keel joined MIT's newly established Design and Computation program, where he researched the individual and collaborative evolution of creative ideas as well as the means for computers to support the creative ideation process.  He situated his research efforts within the more specialized field of Computer Supported Collaborative Work and focused on the conceptualization of tools and methods for collaborative knowledge building, sharing and sense-making. In particular, Dr. Keel set out to invent a tangible improvement to existing systems and methods for collaborative sharing.

22.    Dr. Keel's vision of collaborative knowledge development and sharing expanded after 1997 when he began work on his Ph.D at MIT.  During that time, Dr. Keel devoted his efforts to realizing that vision.  In working on his dissertation, Dr. Keel developed and converged some of his concepts and tools into a unified collaboration platform that he named "EWall."  Dr. Keel's vision for EWall was to realize a computer managed collaboration environment that could facilitate a dynamic and decentralized form of team collaboration, and that could involve very large numbers of remotely, temporally and organizationally distributed participants with different levels of involvement, expertise, and objectives.

23.    As part of the foregoing efforts, an early development of EWall allowed users to create what he referred to as "cards" (representing information and knowledge fragments), as well as to add cards to remote accessible card collections.  The development also introduced functionality to automatically assemble cards by extracting headings, pictures and links from web pages. Because not all cards in a shared card collection were of equal relevance to all team participants, Dr. Keel devised a distributed card environment where anybody could maintain any number of card collections, where cards could be copied between card collections, and where users could control access to their card collections. A key advantage of this type of distributed card collection is the unique ability to effectively recycle and further propagate information through the continuous reuse and re-contextualization of cards by different people and for different purposes.

24.    Early iterations of EWall were intended to support team efforts in the building industry.  After securing funding from the Department of Defense ("DoD"), the EWall project refocused towards Intelligence Analysis, proving an effective use case for EWall.  Intelligence Analysts could monitor multiple intelligence sources, collect and share information of relevance

to their individual investigations, and be notified of other analysts (across agencies and organizations) with relevant expertise or engaged in similar investigations.

25.    In 2004, Dr. Keel summarized the EWall project efforts in his Ph.D dissertation. That same year, on April 29, he filed his first application covering aspects of this technology, United States Provisional Application 60/566,723 ("the '723 Provisional Application").

## IV. THE ASSERTED PATENTS

26.    The Patents-in-Suit originate from parent United States patent application serial number 11/118,301, filed April 29, 2005 (now U.S. Patent No. 7,640,511, issued December 29, 2009), entitled "Methods and Apparatus for Managing and Inferring Relationships from Information," which claims the benefit of the '723 Provisional Application.

27.    Ultimately a series of patent applications would be filed resulting in the issuance of the Asserted Patents. As previously stated, there are three Asserted Patents: 1) U.S. Patent No. 11,036,371 ("the '371 Patent") filed on October 15, 2019 and issued on June 15, 2021 (entitled "Methods and Apparatus for Managing and Exchanging Information Using Information Objects"); 2) U.S. Patent No. 9,817,562 ("the '562 Patent") filed August 22, 2016 and issued on November 14, 2017 (entitled "Methods and Apparatus for Managing and Exchanging Information Using Information Objects"); and 3) U.S. Patent No. 10,664,141 ("the '141 Patent") filed November 8, 2017 and issued May 26, 2020 (entitled "Methods and Apparatus for Managing and Exchanging Information Using Information Objects").  The '371, '562 and '141 Patents are collectively referred to herein as "the Asserted Patents" or "the Patents-in-Suit".

28.    The Asserted Patents are entitled to a priority date of at least April 29, 2004, based on the initial '723 Provisional Application and the fact that the claims of the Asserted Patents are supported by the disclosures existing in the originally filed '723 Provisional Application.

29.     The claims of the Asserted Patents are directed towards patent eligible concepts and are not directed towards an abstract idea.  For purposes of this Complaint, citation will primarily focus on the '371 Patent but these concepts apply to all three Patents-in-Suit.  As set forth in the Background of the Invention, the claims of the Asserted Patents originate from a computer technology field (e.g., "modern information processing systems" as described by '371 Patent at 1:45-47) and focus on problems specifically arising in that field.  At the time of the invention, in 2004, the Written Description sets forth how the World Wide Web was increasing in size in an exponential manner.  As a result, the amount of information available to information processing systems was also increasing at an exponential manner.  *Id.* at 2:42-47, 3:1-16. The problem was compounded when information began to increasingly exist in many different formats and reside in different locations.  Content such as graphics, text, or news stories were located in disparate sources and existed in disparate formats.  *Id.* at 3:17-34. As information was dynamically changing as well as used and modified by different people, existing information processing systems at the time of the invention fell short in allowing users to effectively monitor, analyze and exchange information.  *Id.* at 2:21-47.  By extension, graphical user interfaces for organizing and viewing information also fell short in this vastly changing technological landscape. *Id.* at 1:50-56, 2:28-41.

30.     Rather than simply patenting social media or the idea of promoting conversations and collaboration among users, the Patents-in-Suit are directed towards concrete improvements to the existing computer technology available at the time.  The claims focus on improvements to computer functionality in a specific, concrete way, through the configuration of a "distinct information object." The claims teach that this is done through the extracting of certain data items from disparate external sources, provision of an improved graphical interface by displaying of information objects in a uniform manner, adding of new functionality, and configuring of databases

such that each user can have, access and copy their distinct information objects across other users' collections of these distinct information objects. These claimed technical improvements are directed towards a specific way of arranging and displaying data within a graphical user interface.

31.     The patents describe the new "information objects" as flexible data structures made up of data files as well as metadata extracted from data items from disparate locations. *Id*. at 9:6-11. While sources and formats of data can both be disparate, the claimed inventions teach extraction of certain data (such as a picture, heading and link) to create the distinct information objects that can then be presented in a uniform format. *Id*. at 25:4-40. The displaying of these new information objects also includes certain graphically accessible functions (such as "comment", "vote", "copy", and "link"). Finally, databases are configured such that each user can have at least one collection of these new information objects that are accessible and copyable across other users' collections of information objects. The patents' information data object, and the presentation of the same, all provide an improved user interface which drives social engagement. *See*, '371 patent at 3:8-15 ("The proposed information object mechanism disclosed herein, referred to in some embodiments as IOs, solve this deficiency by introducing a standardized information format that represents a piece of information in an abstract way and links to an original piece of information and that has a standardized look thus allowing users to focus on and compare the information content and context rather than be distracted by the information format and location."), 3:53-4:2, 4:63-5:46.

32.     These concepts appear frequently during prosecution of the patents and have been considered by the Examiner. *See, e.g.,* App. No. 14/664,178, Response dated October 30, 2015 at p. 30 (distinguishing prior art reference on the grounds that patentee's information objects are designed to handle a wide range of data items including hyperlinks as well as feeds, including

news, alerts, announcements and so on that are not all formatted in the same uniform manner); *see also id*. at p. 31 ("Although the starting point is an arbitrary data item, as discussed above, the two processes required by claim 1 [i.e., the "configuring" and "displaying] transform the arbitrary data item into what is represented in a display as an information object.").

33.    All independent claims of the '371, '562 and '141 patents include the above improvements to functionality. Take for example independent claim 1 of the '371 Patent.  For ease of reference, a copy of claim 1 of the '371 Patent reads as follows:

1 (pre) A computer-implemented method, in which at least one computer initiates execution of software instructions to perform computer processes, the method being for interacting with at least one data item obtained from at least one source the at least one source being external to the at least one computer, the computer processes comprising:

(a) responsive to a user selection of the at least one data item:

(a)(1) causing configuring of each of the data items into a distinct information object by extracting, from each data item, extracted data including a picture and a heading, and causing storing of data corresponding to each of the information objects, including a link to the at least one data item, in a database system;

(a)(2) displaying a representation of each of at least two of the information objects in the database system, the representation being in a uniform format, wherein the format includes a card, and, within the card, in uniform locations thereof the picture, the heading, a set of indicators, and a set of graphically accessible functions including:

(a)(2)(i) a comment function, by which users having access to the card comment function can exchange comments relating to the card, such comments being associated with the information object represented by the card;

(a)(2)(ii) a vote function, by which users having access to the card vote function can vote for the card, such votes being associated with the information object represented by the card;

(a)(2)(iii) a copy function, by which users having access to the card copy function in a first collection of cards of a first user can cause the card to appear in a second collection of cards of a second user; and

(a)(2)(iv) a link function, by which users having access to the card link function can invoke the link to the data item;

(a)(2)(v) and wherein the set of indicators includes: an indicator reflecting commenting activity associated with the card; and

(b) wherein the database system has been configured to allow

(b)(i) each user to have at least one user-selected collection of cards representing information objects in the database system and

(b)(ii) cards, regardless of the collections in which they may have first appeared, to be made accessible and copyable across card collections of different users.

34.    The preamble sets forth a computer-implemented method for interacting with at least one data item from at least one source external to the computer.  This refers to an information processing system that is interacting with external data items (such as a computer that is collecting information from data items across the Internet, such as links to news stories or merchandise for sale). Limitation (a)(1) refers to the "configuring" of "distinct information objects" by "extracting" a particular set of "distinct information" from each data item, including a picture and heading", and causing the storing of such along with a link to the external data item. Limitation (a)(2) calls for the "displaying" of information objects in a "uniform format", such as a "card" format, that includes the picture, the heading, a set of indicators, and a set of graphically accessible functions. The specification speaks directly to tangibility, and further the patent eligibility, of the patented process through the creation and manipulation of these graphical information objects that graphically represent information objects of interest to the user.  '371 Patent at 8:54-60.  The remaining limitations of the claim set forth the various graphically accessible functions, including "comment," "vote," "copy," and "link."  All of this relates to the patent eligible concepts listed above, namely the configuring and display of a uniform format of information extracted from

diverse external links.  In addition, the database system is configured to allow each user to have a user-selected collection of "cards" representing information objects that can be copyable across card collections of different users. *See* claim 1(b)(i)-(ii). The uniform graphically accessible functions are set forth to allow for commenting, voting, copying, and linking of cards from a first collection and the ability to cause cards to appear in a second collection of a user having access to the cards of a first collection from a first user.  Claim 1(a)(2)(i)-(iv).  All of this pertains to patentability, namely assisting users in identifying content and subject matter that may be of interest and driving social interaction, providing more functions related to those interactions that are built into this display, and facilitating storage, accessibility and sharing accordingly, all within a computer network in a new way.

35.    The '562 Patent involves the same concepts, language and technology of the '371 Patent, but has an earlier issuance date of 2017 (as opposed to the 2021 issuance date of the '371 Patent).  The '562 Patent contains 1 independent claim (claim 1) and 21 dependent claims.  All 22 claims are "computer-implemented method" claims. The same advantages exist in the claims as written for the '562 Patent.  The '562 Patent also brings into play several other related concepts including an "instant messaging function" and a "replicate" function.  *See* '562 Patent, claim 1(d). For ease of reference, a copy of clam 1 of the '562 Patent reads as follows:

> 1 (pre) A computer-implemented method, in which at least one computer initiates execution of software instructions to perform computer processes, the method being for interacting with at least one data item obtained from at least one source and rendering the at least one data item accessible from a database system, wherein the at least one source is external to the database system, the computer processes comprising:
>
> (a) configuring each of the data items into a distinct information object by extracting, from each data item, extracted data including a picture, a heading, and a link to the data item;
>
> (b) storing data corresponding to each of the information objects in the database

system:

(c) using the extracted data from a plurality of the data items to make available for display a representation of each of at least two of the information objects in the database system, the at least two information objects being selected for display, the representation being in a uniform format, wherein the format includes a card, and, within the card, in uniform locations thereof, the picture, the heading, a set of indicators, and a function mechanism giving graphical access to a set of functions, (d) wherein the functions include:

> (d)(1) an instant messaging function, by which users having access to the card can exchange author- and time-stamped messages relating to the information object, such messages being associated with the information object and accessible to users who view the information object;

> (d)(2) a vote function, by which each user having access to the card can provide one vote for the information object;

> (d)(3) a replicate function, by which each user having access to the card in a first collection of cards can cause the card to be replicated in a second collection of cards; and

> (d)(4) a link function, by which each user having access to the card can invoke the link to the data item; and

> (d)(5) wherein the indicators include:

> (d)(5)(i) a message indicator that displays a number of instant messages associated with the information object; and

> (d)(5)(ii) a vote indicator that displays a number of votes associated with the information object; and

(e) wherein the database system has been configured to allow

> (e)(i) each user to have at least one user-selected collection of cards in the database system and

> (e)(ii) each card in the database system, with any associated picture and heading, and other associated data, regardless of the collection in which it may have first appeared, to be accessible and replicable across card collections of users.

36.    Similarly, the same concepts are also found in the independent claims of the '141

Patent, including independent claim 1.  For ease of reference, a copy of clam 1 of the '141 Patent

reads as follows:

1 (pre) A computer-implemented method, in which at least one computer initiates execution of software instructions to perform computer processes, the method being for interacting with at least one data item obtained from at least one source, the computer processes comprising:

(a) responsive to a user selection of the at least one data item:

(a)(1) causing configuring of each of the data items into a distinct information object by extracting, from each data item, extracted data including a picture, a heading and a link to the data item, and causing storing of data corresponding to each of the information objects in a database system;

(a)(2) displaying a representation of each of at least two of the information objects in the database system, the representation being in a uniform format, wherein the format includes a card, and, within the card, in uniform locations thereof the picture, the heading, a set of indicators, and a set of graphically accessible functions including:

(a)(2)(i) a comment function, by which users having access to the card comment function can exchange comments relating to the card, such comments being associated with the information object represented by the card;

(a)(2)(ii) a vote function, by which users having access to the card vote function can vote for the card, such votes being associated with the information object represented by the card;

(a)(2)(iii) a copy function, by which users having access to the card copy function in a first collection of cards can cause the card to appear in a second collection of cards; and

(a)(2)(iv) a link function, by which users having access to the card link function can invoke the link to the data item;

(a)(2)(v) and wherein the set of indicators includes: an indicator reflecting commenting activity associated with the card; and

(b) wherein the database system has been configured to allow

(b)(i) each user to have at least one user-selected collection of cards representing information objects in the database system and

(b)(ii) at least some content of cards, including any associated picture and heading, regardless of the collections in which they may have first appeared, to be made accessible and copyable across card collections of users.

37.    The claims include additional features which are beyond well-understood, routine, or conventional activity, and cannot be read as simply applying an abstract idea to a computer; nor do the claims merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet.  As set forth above, the patent disclosure enumerates the problems in information processing systems and graphical user interfaces at the time (including the need to instill uniformity through the extraction and processing of information located across disparate sources, placed in a graphical user interface providing increased functionality) and incorporates the solution as part of the patent claims.

38.    All of this was front and center during prosecution and considered by the Examiner in overcoming a Section 101 rejection. In a May 2017 Response to an Office Action in which the Examiner raised Section 101, the patentee explained how the claims define "significantly more" than an abstract idea because "claim 1 defines not only (i) configuring data items as 'information objects' by extracting information from them and representing the extracted information 'in a uniform format' as a card having defined components, but also (ii) providing a set of functions and indicators that are built into the card format, along with (iii) storing the created information objects in a data system , and (iv) configuring the database system in a manner wherein 'each card in the database system, with any associated picture and heading, and other associated data, regardless of the collection in which it may have first appeared, is accessible and replicable across card collections of user."  The patentee went further to explain that the invention was not merely

"putting data items into a card format" but was instead establishing "an entire environment in which arbitrary third-party data items can be shared as information objects and users can interact with the information objects based on the functions and indicators provided in the information objects themselves.  Providing the ability to share and interact with data items in this new environment amounts to an improvement in the operation of computers, and is manifestly patent eligible."  *Id*. at p. 11. A Notice of Allowability followed on July 10, 2017.  All of this underscores the tangible improvement to a manipulable new environment and graphical user interface provided by the claims and thus satisfies both Step One and Step Two of *Alice* eligibility.

39.    The patented claims cover core features of social media platforms that are ubiquitous today, such as visualizing media posts from disparate external sources in a uniform card format, and for liking (voting), sharing (replicating) and commenting (messaging).

40.    The patented claims, including the Asserted Claims, are all method claims and thus do not require marking.  For at least this reason, Plaintiff has complied with its marking obligations under 35 U.S.C. § 287 and it entitled to seek full past damages available under the law.

## V. **THE ACCUSED PRODUCTS AND METHODS**

41.    The Asserted Claims are directed towards computer-implemented methods.  Defendant makes, sells, uses, offers for sale, sells, tests, markets and/or imports into the United States systems and instrumentalities that, when used, infringe the claims of the Asserted Patents.

42.    More specifically, Defendant owns and operates a web site accessible at http://facebook.com, as well as software applications and/or mobile applications that allow users to access a mobile version of Facebook.com.  Herein, the term "Accused Products" refers to all products manufactured, used, tested, imported, offered for sale, or sold by or on behalf of Defendant practicing the claims of the Patents-in-Suit and all processes employed by Defendant

that practice the claims of the Patents-in-Suit, consisting of at least Defendant's "Wall", "Timeline" and/or "Newsfeed" features and functionality that is accessible via, and provided through, Defendant's Facebook website and/or software/mobile application versions of Facebook.com.

43.     End users of the Accused Products create a personal "profile" that is used to access and interact with not only the Accused Products, but other end users of the Accused Products and the greater worldwide online environment.

44.     The Facebook "Wall" is a core feature of the Accused Products and refers to a feature on individual end user profiles where users and their "friends" (e.g., their contacts having their own individual profiles) can post messages, images, or share specific content. In this way, the Wall is akin to a virtual bulletin board.  As users add to their Wall, the Wall will display a chronological list of posts and interactions. The Wall thus provides an interactive tool for users to engage with one another, comment on posts and share desired content amongst themselves. Privacy settings can be adjusted to control who can view, post, and interact with the content shared on a user's Wall, further providing a customizable and secure interface. An exemplar photograph of a Wall for the user profile "Jade Travel" is shown below:[4]

---

[4] https://imgur.com/zBYYN



45.     Facebook "Timeline" is a feature that organizes and displays a user's profile and associated events in chronological order. Timeline allows users to commemorate desired content, and presents a visual summary of a user's posts, photos, and life events. In this way, Timeline allows users and their friends to browse through their shared history and past experiences. Like

Wall, Timeline has privacy settings so users can control who sees their Timeline.  An exemplar photograph of a Timeline for user profile "Jane Smith" is shown below:[5]



46.    Facebook "News Feed" feature is a continually updating list of stories, posts, and multimedia content from user's pages and "groups" an individual user is connected to on the Accused Products. In this way, News Feed functions as a central hub of sorts, displaying content to users based on their interests, interactions, and connections. In addition, News Feed will display

---

[5] https://socialpilot.co/social-media-terms/what-is-facebook-timeline

content that is algorithmically determined to be relevant to individual users of the Accused Products. Users utilize News Feed to see content from friends, family and pertinent sources. Likewise, businesses can use News Feed to increase their commercial reach and engagement to targeted potential consumers. An exemplar photograph illustrating the use of News Feed is shown below:[6]



47.    The Accused Products, when utilized, practice the claimed computer-implemented methods found within the Asserted Patents.    When a data item shared by a user is found on a website external of the Facebook database system (e.g., a link to an article hosted by an external website), Facebook makes the data item accessible to other users in a uniformly formatted distinct information object.  Defendant initiates execution of software instructions on at least one computer to perform computer processes for interacting with at least one data item obtained from at least

---

[6] https://about.fb.com/news/2021/03/more-control-and-context-in-news-feed/

one source, the at least one source being external to the at least one computer. This infringing methodology infringe in each of the above-identified environments (Wall, Timeline and/or News Feed) and infringe at least claim 1 of each Patent-in-Suit.

48.    Defendant performs the Accused Method in response to a user selection of at least one data item. Defendant configures data items into a distinct information object by extracting, from each data item, extracted data including a picture, a heading, and a link to the data item, in a database system.  This is illustrated in the below exemplar image, where a post is shared from an external source (National Geographic Travel article on "ten ways to see Europe by train"):



49. This "configuration" performed by Defendant takes place when an end user posts a link to an external source (in the above example, the external source is a travel article from National Geographic Travel) to his or her Wall and/or Timeline. In addition, the above configuration takes place when such uniformly formatted distinct information objects (posts linking to sources) are presented on users' Newsfeed.

50. These "distinct information objects" or "cards" (see 5:42-48 of the '562 Patent) have a uniform format with uniform locations of the picture, the heading, a set of indicators, and mechanisms giving graphical access to a set of functions as claimed. Defendant displays, via the Wall, Timeline and/or News Feed features, a representation of each of these information objects in the uniform format.

51. The graphically accessible functions are labeled in the above exemplar photograph, and include a comment function, by which users having access to the card comment function can exchange comments relating to the card, such comments being associated with the information object represented by the card. In the above example, a "comment" graphical feature allows users to comment on the linked National Geographic travel article.

52. The graphically accessible functions are labeled in the above exemplar photograph, and include a vote function, by which users having access to the card vote function can vote for the card, such voters being associated with the information object represented by the card. In the above example, a "like" graphical features serves as the claimed "vote" mechanism, and allows users to "like" the National Geographic travel article.

53. The graphically accessible functions are labeled in the above exemplar photograph, and include a repost copy function, by which users having access to the card copy function in a first collection of cards of a first user can cause the card to appear in a second collection of cards

of a second user.  In this way, a user may "copy" an article to their own Wall, or share with their

own friends and/or groups.  As one example, the "share" button allows a second user to copy and

repost the linked National Geographic travel article.

54.     The graphically accessible functions are labeled in the above exemplar photograph,

and include a link function, by which users having access to the card link function can invoke the

link to the data item. In the above example, there is a link to source displayed such that a user may

click the image and be taken to the source travel article on National Geographic's page.

55.     In addition, there are a set of indicators, including an indicator reflecting comments

activity associated with the card.  In the above example, the indicators include number of likes.

56.     Defendant's Accused Products are configured to interact with Defendant's database

system that has been configured to allow each user to have at least one user-selected collection of

cards representing information objects in the database system and cards, regardless of the

collections in which they may have first appeared, to be made accessible and copyable across card

collections of different users.  This is evidenced by the above example, wherein users may post a

link to an external source, and connected users may view, copy and repost those same links on

their respective collections.

57.     Defendant also performs the other claimed functions, such as "instant messaging"

with the information objects, "voting" on the information objects, "replicating" the information

objects, and creating "selected collection[s]" of information objects.

58.     The Accused Products' features have evolved over time to fall within the scope of

Dr. Keel's patent claims.  While the "Wall" and/or "Timeline" Facebook functionality/feature was

first debuted around September 2004, upon information and belief, and the "News Feed" Facebook

functionality/feature debuted in September 2006, upon information and belief, other functionality

necessary to meet the patented claims was not introduced until after Wall and News Feed first launched.

59.    Defendant is not licensed to the Asserted Patents, either expressly or implicitly, nor do they enjoy the benefit from any right in or to the Asserted Patents.

## COUNT 1: PATENT INFRINGEMENT OF U.S. PATENT NO. 11,036,371

60.    Plaintiff restates and realleges the preceding paragraphs of this Complaint, including those describing the features and operation of the Accused Products, as though fully set forth herein.

61.    On June 15, 2021, U.S. Patent No. 11,036,371 was duly and legally issued for "Methods and Apparatus for Managing and Exchanging Information Using Information Objects." The '371 Patent is presumed valid.  A true and correct copy of the '371 Patent is attached hereto as Exhibit A and made a part hereof.

62.    Plaintiff is the owner of all right and title in the '371 Patent, including all rights to enforce and prosecute actions for infringement of the '371 Patent and to collect damages for all relevant times against infringers of the '371 Patent.  Accordingly, Plaintiff possesses the exclusive right and standing to prosecute the present action for infringement of the '371 Patent by Defendant.

63.    Defendant has, under 35 U.S.C. § 271(a), directly infringed, and/or continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '371 Patent, by making, using, testing, selling, offering for sale and/or importing into the United States Defendant's Accused Products.

64.    On information and belief, Defendants have made no attempt to design around the claims of the '371 patent.

65.    On information and belief, Defendants did not have a reasonable basis for believing that the claims of the '371 patent were invalid.

66.    Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is, thus, liable to Plaintiff in an amount that adequately compensates for its infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 2: PATENT INFRINGEMENT OF U.S. PATENT NO. 9,817,562

67.    Plaintiff restates and realleges the preceding paragraphs of this Complaint, including those describing the features and operation of the Accused Products, as though fully set forth herein.

68.    On November 14, 2017, U.S. Patent No. 9,817,562 was duly and legally issued for "Methods and Apparatus for Managing and Exchanging Information Using Information Objects." The '562 Patent is presumed valid. A true and correct copy of the '562 Patent is attached hereto as Exhibit B and made a part hereof.

69.    Plaintiff is the owner of all right and title in the '562 Patent, including all rights to enforce and prosecute actions for infringement of the '562 Patent and to collect damages for all relevant times against infringers of the '562 Patent. Accordingly, Plaintiff possesses the exclusive right and standing to prosecute the present action for infringement of the '562 Patent by Defendant.

70.    Defendant has, under 35 U.S.C. § 271(a), directly infringed, and/or continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '562 Patent, by making, using, testing, selling, offering for sale and/or importing into the United States Defendant's Accused Products.

71.     On information and belief, Defendants have made no attempt to design around the claims of the '562 patent.

72.     On information and belief, Defendants did not have a reasonable basis for believing that the claims of the '562 patent were invalid.

73.     Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is, thus, liable to Plaintiff in an amount that adequately compensates for its infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**<u>COUNT 3: PATENT INFRINGEMENT OF U.S. PATENT NO. 10,664,141</u>**

74.     Plaintiff restates and realleges the preceding paragraphs of this Complaint, including those describing the features and operation of the Accused Products, as though fully set forth herein.

75.     On May 26, 2020, U.S. Patent No. 10,664,141 was duly and legally issued for "Methods and Apparatus for Managing and Exchanging Information Using Information Objects." The '141 Patent is presumed valid.  A true and correct copy of the '141 Patent is attached hereto as Exhibit C and made a part hereof.

76.     Plaintiff is the owner of all right and title in the '141 Patent, including all rights to enforce and prosecute actions for infringement of the '141 Patent and to collect damages for all relevant times against infringers of the '141 Patent.  Accordingly, Plaintiff possesses the exclusive right and standing to prosecute the present action for infringement of the '141 Patent by Defendant.

77.     Defendant has, under 35 U.S.C. § 271(a), directly infringed, and/or continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including

without limitation at least claim 1 of the '141 Patent, by making, using, testing, selling, offering for sale and/or importing into the United States Defendant's Accused Products.

78.     On information and belief, Defendants have made no attempt to design around the claims of the '141 patent.

79.     On information and belief, Defendants did not have a reasonable basis for believing that the claims of the '141 patent were invalid.

80.     Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is, thus, liable to Plaintiff in an amount that adequately compensates for its infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## VI. JURY DEMAND

81.     Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a.     Judgment that one or more claims of the Asserted Patents have been directly infringed, either literally or under the doctrine of equivalents, by Defendant;

c.     Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, including enhanced damages as permitted by 35 U.S.C. § 284;

e.     That Plaintiff be granted pre-judgment and post-judgment interest on the damages

caused by Defendant's infringing activities;

f.      That the Court declare this an exceptional case and award Plaintiff its reasonable

attorney's fees and costs in accordance with 35 U.S.C. § 285; and

h.      That Plaintiff be granted such other and further relief as the Court may deem just

and proper under the circumstances.


Date:   July 30, 2025                              Respectfully submitted,

_/s/ Kerry Timbers_
Kerry Timbers (BBO # 552293)
Kevin R. Mosier (BBO # 703739)
SUNSTEIN LLP
100 High Street, 20th Floor
Boston, MA 02110-2321
617-443-9292
ktimbers@sunsteinlaw.com
kmosier@sunsteinlaw.com


Jonathan T. Suder *
        (Texas Bar # 19463350)
Michael T. Cooke *
        (Texas Bar # 04759650)
Dave R. Gunter *
        (Texas Bar # 24074334)
Alexander Yow *
        (Texas Bar # 24143547)
FRIEDMAN, SUDER & COOKE
604 East 4th Street, Suite 200
Fort Worth, TX 76102
817-334-0400
Fax: 817-334-0401
mtc@fsclaw.com
jts@fsclaw.com
gunter@fsclaw.com
ayow@fsclaw.com

(* pending admission _pro hac vice_)

_ATTORNEYS FOR PLAINTIFF COGMEDIA LLC_