**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **COGMEDIA LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**META PLATFORMS, INC.,**<br><br>**Defendant.** | **Civil Action No.**<br>**25-12127-BEM** |

**MEMORANDUM AND ORDER**

**MURPHY, J.**

Plaintiff Cogmedia LLC ("Cogmedia") brought this suit alleging that Defendant Meta Platforms, Inc. ("Meta") infringed three patents: U.S. Patent Nos. 11,036,371 (the "'371 Patent"), 10,664,141 (the "'141 Patent"), and 9,817,562 (the "'562 Patent") (collectively, the "Patents-in-Suit"). Before the Court now are the parties' briefs on claim construction. The Court construes the eight terms at issue as set forth below.

## I. Background

The three Patents-in-Suit relate to a computer-implemented method by which users can interact with, extract, store, and display data via 'information objects' and 'cards.' '371 Patent, Abstract.[1] According to the patentees, "[e]mbodiments of the invention incorporate advanced graphical user interfaces and functions to address the shortcomings in conventional systems." *Id.* at 4:37–39. The '371 Patent is a continuation of the '141 Patent, which is, in turn, a continuation

[1] The '371 Patent is found at Dkt. 76-4, the '141 Patent is found at Dkt. 76-3, and the '562 Patent is found at Dkt. 76-2.

of the ’562 Patent, and the three Patents-in-Suit share similar specifications. *See generally* ’371 Patent; ’141 Patent; ’562 Patent. The ’562 Patent was filed August 22, 2016, and issued November 14, 2017. ’562 Patent at 2. The ’141 Patent was filed November 8, 2017, and issued May 26, 2020. ’141 Patent at 2. The ’371 Patent was filed October 15, 2019, and issued June 15, 2021. ’371 Patent at 2.

On July 30, 2025, Plaintiffs brought suit, alleging that Defendants’ products—the website accessible at http://facebook.com and software applications and/or mobile applications allowing users to access a mobile version of the website—infringe claims in the Patents-in-Suit. *See generally* Dkt. 1. The case has now reached the claim construction stage. The parties filed claim construction briefs concerning the eight claim terms in dispute, and the Court conducted a *Markman* hearing on July 24, 2026, at which the parties presented their proposed constructions.

## II. Legal Framework

The purpose of claim construction is to “determin[e] the meaning and scope of the patent claims asserted to be infringed.” *Markman v. Westview Instruments, Inc.* (*Markman I*), 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff’d*, 517 U.S. 370 (1996). The construction of claim terms is a question of law. *Markman v. Westview Instruments* (*Markman II*), 517 U.S. 370, 372 (1996) (“[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.”). “Claim terms are generally given their plain and ordinary meanings to one of skill in the art when read in the context of the specification and prosecution history.” *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2013). “There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own

lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Id.* (citation and internal quotation marks omitted).

"In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). "In construing claim terms, courts look to 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *3-D Matrix, Inc. v. Menicon Co.*, 2016 WL 111410, at *1 (D. Mass. Jan. 11, 2016) (quoting *Phillips*, 415 F.3d at 1314).

**A. <u>Claim Language</u>**

Claim construction begins with the language of the claims themselves, because "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted). "[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application." *Id.* at 1312–13 (internal quotation marks omitted). "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* at 1314; *see also id.* ("This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term."). For example, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.*

[2] Neither party argues that disavowal or lexicography applies.

Additionally, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

**B. Specification**

The claims, however, "do not stand alone," but "are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* (citation and internal quotation marks omitted). A "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Therefore, "the specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "The specification, as the patentee's description of the invention, defines 'the scope and outer boundary' of the claims and, thus, 'claims cannot be of broader scope than the invention that is set forth in the specification.'" *Actifio, Inc. v. Delphix Corp.*, 150 F. Supp. 3d 117, 120 (D. Mass. 2015) (quoting *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338–40 (Fed. Cir. 2006)).

"Nevertheless, the court must be careful to 'us[e] the specification [only] to interpret the meaning of a claim' and not to 'import[] limitations from the specification into the claim.'" *3-D Matrix*, 2016 WL 111410, at *2 (quoting *Phillips*, 415 F.3d at 1323); *see also Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). A patent's "claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). Although this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on

understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323. Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

### C. Prosecution History

Courts also consider the prosecution history, which consists of the record of the proceedings before the United States Patent and Trademark Office ("PTO") and prior art cited during the examination of the patent. *Id.* at 1323. The prosecution history can provide additional insight into how the inventor and the PTO understood the patent, which "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317 (citing *Vitronics*, 90 F.3d at 1582–83). However, because the prosecution history "often lacks the clarity of the specification" it "thus is less useful for claim construction purposes." *Id.* As a result, courts must "not rely on the prosecution history to construe the meaning of the claim to be narrower than it would otherwise be unless a patentee limited or surrendered claim scope through a clear and unmistakable disavowal."[3] *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1322 (Fed. Cir. 2013).

---

[3] Because prosecution history is especially critical to evaluate disclaimed scope and disavowal, *see, e.g.*, *RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*, 342 F. App'x 628, 630 (Fed. Cir. 2009) ("The prosecution history must be reviewed when interpreting a claim to exclude any interpretation that was disclaimed or disavowed during prosecution." (internal quotation marks omitted)); *Abbott Lab'ys v. TorPharm, Inc.*, 300 F.3d 1367, 1372 (Fed. Cir. 2002) ("Of course, prosecution history may limit claim scope if the patentee disclaimed or disavowed a particular interpretation of the claims during prosecution. This principle does not, however, mean that any words appearing in the prosecution history but not in the issued claims are forever banished. The prosecution history inquiry asks not what words the patentee discarded, but what subject matter the patentee relinquished or disclaimed."), here, where neither party argues that disavowal applies, the prosecution history is of limited utility.

### D. Extrinsic Evidence

Finally, courts may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman I*, 52 F.3d at 980). Such evidence "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319. "[W]hile extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of the claim language," *id.* at 1317 (citation and internal quotation marks omitted), because extrinsic evidence suffers from several defects, including its independence from the patent, potential bias, and varying relevance, *see id.* at 1318–19; *see also V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) ("The intrinsic record in a patent case is the primary tool to supply the context for interpretation of disputed claim terms."). Therefore, it is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. Put simply, extrinsic evidence may not be used to "change the meaning of claims in derogation of the" intrinsic evidence. *Id.*

## III. Claim Construction

### A. *O2 Micro* and Plain and Ordinary Meaning

Before turning to the individual claim terms in dispute, it is useful to address the parties' overarching arguments, which are consistent across terms, and to set forth the governing legal principles. Cogmedia argues that each term has its plain and ordinary meaning and that no term requires construction by the Court. *See generally* Dkt. 76; *see also* Dkt. 75 at 2–3. Meta agrees that the plain and ordinary meaning governs in each case, but proposes a construction for each disputed claim term. Dkt. 75 at 2–3. Meta relies principally on *O2 Micro International Ltd. v.*

*Beyond Innovation Technology Co.*, for the proposition that "when the parties present a 'fundamental dispute regarding the scope of a claim term,' the court has a duty to resolve that dispute, even where the term carries a plain and ordinary meaning." *See* Dkt. 77 at 10 (quoting 521 F.3d 1351, 1362 (Fed. Cir. 2008)). Cogmedia counters that "*O2 Micro* is often misread to suggest that the mere existence of a so-called dispute necessarily compels the Court to provide an affirmative construction as opposed to holding the plain and ordinary meaning controls with no further construction," but that "[i]t does not." Dkt. 76 at 9. This dispute is central to the case.

In *O2 Micro*, the Federal Circuit considered whether the district court had been obligated to construe the term "only if." *See generally* 521 F.3d 1351. By way of background, the Federal Circuit explained:

> At the *Markman* hearing, . . . Defendants–Appellants BiTEK and Lien Chen asserted that "only if" should mean "exclusively or solely in the event that," while defendant SPI/FSP asserted that it should mean "never except when." In spite of the differences in word choice, Defendants–Appellants seemed to agree that these constructions are substantially identical in meaning. [Plaintiff–Appellee] O2 Micro, on the other hand, maintained that no construction was necessary because the claim term "only if" consists of "two simple, plain English words." . . . [I]n its *Markman* order, the district court ruled that this term "needs no construction" because it "has a well-understood definition, capable of application by both the jury and this court in considering the evidence submitted in support of an infringement or invalidity case."

*Id.* at 1357 (quoting *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, No. 2:04-cv-32, Dkt. 129 ¶ 7 (E.D. Tex. Aug. 26, 2005)). The Federal Circuit held that the district court had erred by failing to construe "only if" because "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *Id.* at 1362. The court emphasized that "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 1361.

However, *O2 Micro* does not mandate that the Court's obligation to construe terms is boundless, or that it is never permissible to assign a claim term the plain and ordinary meaning. The Federal Circuit recognized in *O2 Micro* that "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims." *Id.* (emphasis in original). "Rather, '[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.'" *Id.* (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)). And the Federal Circuit has affirmed a district court's decision not to construe a claim term when, for example, the plain and ordinary meaning is clear. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) ("At the claim construction stage, the district court rejected Samsung's argument that ongoing activity is required—the heart of the parties' disagreement—and declined to further construe the term because it was a 'straightforward term' that required no construction. . . . Because the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the claim term."). Likewise, a court need not construe a term when, in adopting the plain and ordinary meaning, the court clearly rejects one of the parties' proposals and thereby resolved the dispute. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("According to Defendants, the district court shirked its responsibility to construe a disputed claim term by adopting 'plain and ordinary meaning' . . . . Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction, which required an IP address."); *see also In re Body Sci. LLC Pat. Litig.*, 2014 WL 5313861, at *9 (D. Mass. Oct. 17, 2014) ("In such circumstances, the prudent course is to adopt the plain and ordinary meanings of the terms. The words of the patent, as chosen by its drafter, can be readily

comprehended by a layperson, and their adoption would resolve the parties' dispute."). In short, the Federal Circuit has made clear that it is only error to adopt the plain and ordinary meaning when so doing "fail[s] to resolve the parties' dispute," and that the parties must "raise an actual dispute regarding the proper scope of the[] claims." *O2 Micro*, 521 F.3d at 1360.

### B. Disputed Terms

#### 1. "at least one computer initiates execution of software instructions to perform computer processes"

| Cogmedia's Proposal | Meta's Proposal | The Court's Construction |
|---|---|---|
| plain and ordinary meaning; no construction necessary | plain and ordinary meaning, which is "at least one computer initiates execution of software instructions [residing on the at least one computer] to perform computer processes" | plain and ordinary meaning; no construction necessary |

Meta argues that the software instructions referenced in the claim term must reside on the computer executing them and cites language from the specification and its expert report in support. Dkt. 77 at 18–19; *see also* Dkt. 82 at 11–13.[4] Cogmedia, by contrast, argues that the patent does not require that the software instructions reside on any specific computer. Dkt. 76 at 12–13; *see also* Dkt. 81 at 7–8.

The Court agrees with Cogmedia and finds that Meta's construction attempts to impermissibly import a limitation from the specification into the claims. *See Animatics Corp. v. Quicksilver Controls, Inc.*, 102 F. App'x 659, 664 (Fed. Cir. 2004) ("It is axiomatic that limitations

[4] Meta also repeatedly raises arguments related to Cogmedia's infringement contentions. *See* Dkt. 77 at 7, 9, 11 –13, 17–18, 23–24. But a party's infringement contentions should not inform this Court's claim construction. *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) ("It is well settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence."). Accordingly, the Court declines at this stage to engage with Meta's arguments regarding Cogmedia's infringement contentions in this section and all others.

from the specification should not be read into the claims."). More specifically, Meta conveniently omits key words from the specification language it cites—words which make clear that the cited embodiments are not intended to limit the claims to those specific embodiments. *See, e.g.*, '371 Patent at 6:37–39 ("*Other embodiments* of the invention that are disclosed herein include software programs to perform the [disclosed] steps and operations." (emphasis added)); *id.* at 6:40–45 ("*One such embodiment* comprises a computer program product that has a computer-readable medium including computer program logic encoded thereon." (emphasis added)); *see also id.* at 6:31–35 ("Embodiments of the invention include *any type* of computerized device, workstation, handheld or laptop computer, or the like configured with software and/or circuitry (e.g., a processor) to process *any or all of the method operations* disclosed herein." (emphases added)).

"While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013); *see also IQRIS Techs. LLC v. Point Blank Enters., Inc.*, 130 F.4th 998, 1005 (Fed. Cir. 2025) ("Even when all embodiments in the written description depict a pull cord that is directly pulled, our precedent counsels against reading this requirement into the claims when the claims do not expressly require as much."). Here, it would be improper to read into the claims the requirement that the software instructions reside on the "any one computer"—or anywhere specific—when neither the language of the claims themselves or the specification dictates such a result.

And while Meta's expert asserts that software instructions must be loaded into the local memory coupled to the processor executing the instructions, Dkt. 78 ¶¶ 45–46, "there is no need here to consult the extrinsic evidence, which cannot change the construction compelled by the intrinsic evidence." *St Case1tech, LLC v. Squires*, 2026 WL 456602, at *4 (Fed. Cir. Feb. 18,

2026); *see also Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1372 (Fed. Cir. 2022) ("Extrinsic evidence, we have observed, is generally 'less reliable' for claim construction purposes than the intrinsic record.").

Thus, the Court need not construe the term because, in concluding that the term has its plain and ordinary meaning, the Court has rejected Meta's limiting construction and thereby resolved the parties' dispute. *See Finjan, Inc.*, 626 F.3d at 1206–07 ("The district court construed 'addressed to a client' as having 'its plain and ordinary meaning,' but also observed that 'the defendant's proposed construction would unjustifiably narrow the term's broad scope, which was not explicitly limited or redefined by the specification.' . . . Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction, which required an IP address." (quoting *Finjan Software, Ltd. v. Secure Computing Corp.*, No. 06-cv-369, Dkt. 142 at 1 & n.1 (D. Del. Dec. 11, 2007)). In sum, the Court concludes that the claim term has its plain and ordinary meaning and that further construction is not warranted.

**2. <u>"vote function"</u>**

| **Cogmedia's Proposal** | **Meta's Proposal** | **The Court's Construction** |
| --- | --- | --- |
| plain and ordinary meaning; no construction necessary | plain and ordinary meaning, which is "function that expresses a decision" | "function that expresses a preference, choice, or reaction" |

Meta argues that the specification and cited references make clear that "vote function" excludes reactions and means a "function that expresses a decision." Dkt. 77 at 12–13; Dkt. 82 at 14–16. Cogmedia, by contrast, argues that the plain language of the claims is dispositive, and points to the specification's description of preferred embodiments as "entirely consistent with its plain and ordinary meaning." Dkt. 76 at 14 (citing '371 Patent at 10:33–39).

"Vote function" appears in the following asserted claims:

- "a vote function, by which users having access to the card vote function can vote for the card, such votes being associated with the information object represented by the card" ('371 Patent, Claims 1, 15; '141 Patent, Claims 1, 17); and
- "a vote function, by which each user having access to the card can provide one vote for the information object" ('562 Patent, Claim 1).

The specification explains that

> [a] vote function allows collaborating users to exchange their opinions about the relevance of IOs. Every user is given one supporting vote for each card (TO). The icon color indicates the addition of recent and the presence of past votes. The numerical counter next to the icon displays the total number of supporting votes.

'371 Patent at 10:33–39. Neither the claim language nor the specification language indicates that vote function must be limited to expressing a decision.

The cited references support this same conclusion. At most, the prior art references acknowledge that voting may be used to reach a decision. *See, e.g.*, Dkt. 79-7 at 5:24–26 ("Each discussion item may itself include at least one vote/poll item that allows discussion participants to decide issues related to the discussion."). But they do not limit voting to the expression of a decision, and indeed contemplate that voting has a broader meaning, at least in the context of the patent. The specification of one cited reference states that a user can "decide[] to vote on (that is, *indicate a preference about*) a discussion object." Dkt. 79-8 at [0253] (emphasis added). And another prior art reference states that "votes may be cast according to a specified rating scale (e.g., 'poor,' 'average,' and 'good')," and depicts facial expression "icons" in the figure referenced in the context of voting. Dkt. 79-9 at 6:16–18; *id.*, Fig. 4; *see also id.* at 8:17–23 ("Also displayed is a set of icons 62 for voting on the blurb. In this example, three rating levels are supported: good, neutral, and poor. The voting interface may alternatively use a different number of rating levels.

For example, a 2-level scale may be used in which users are asked whether they liked the blurb, or a 5-level scale may be used in which users are asked to rate the blurb on a scale of 1-5.”).[5]




*FIG. 4*

Figure 9 of the Patents-in-Suit likewise labels one display bar “Rating/Vote,” ’371 Patent, Fig. 9; ’562 Patent, Fig. 9; ’141 Patent, Fig. 9, which suggests that voting is not limited to votes “for” or “against,” as Meta argues, Dkt. 82 at 14.[6]

The dictionaries that Meta cites likewise make clear both that “vote” has multiple plain and ordinary meanings such that construction is warranted, *see O2 Micro*, 521 F.3d at 1361 (“A determination that a claim term ‘needs no construction’ or has the ‘plain and ordinary meaning’

[5] Meta contends that, voting scale notwithstanding, “the vote must still indicate whether the user is ‘in favor of’ the card or not.” Dkt. 77 at 12 (quoting Dkt. 79-9 at 8:29). The Court does not find that this language moves the needle, however, given that the relevant language reads only that “[c]ertain types of user actions, such as sending the blurb to a friend, may optionally be treated as votes in favor of the blurb.” Dkt. 79-9 at 8:28–30.

[6] Meta’s own expert concedes that even a voting system expressing whether or not a user supports an object need not rely on binary support/not support input; instead, for example, a numerical rating system could be transformed into binary information after the user inputs it. Dkt. 78 ¶ 32 (“A vote input may not necessarily be binary.”).

may be inadequate when a term has more than one 'ordinary' meaning."), and that "vote function" does not have the narrow construction Meta proposes. *See, e.g.*, Dkt. 79-10 at 4 (Webster's New World Dictionary defining "vote" as "a decision on a proposal, etc., or a choice between candidates for office" and "the expression of a such a decision or choice"); Dkt. 79-11 at 4 (The Oxford Compact English Dictionary defining "vote" as "a formal indication of a choice between two or more candidates or courses of action"); Dkt. 79-12 at 4 (The Chambers Dictionary defining "vote" as "an expression of a wish or opinion in an authorized formal way").

The Court finds that "vote" as used in the claims—read in light of the specification and affording the proper weight to the extrinsic evidence—is not limited to the expression of a decision, but rather expresses an individual user's preference, choice, or reaction to an object.[7] Accordingly, the Court will adopt the following construction: "function that expresses a preference, choice, or reaction."

### 3. <u>"replicate function"/"copy function"</u>

| **Cogmedia's Proposal** | **Meta's Proposal** | **The Court's Construction** |
|---|---|---|
| plain and ordinary meaning; no construction necessary | plain and ordinary meaning, which is "function that duplicates" | plain and ordinary meaning; no construction necessary |

Meta argues that the claim language and other intrinsic and extrinsic evidence indicate that replicating and copying are distinct from sharing, and that both claim terms should therefore be construed as "function that duplicates." Dkt. 77 at 13–16; *see also* Dkt. 82 at 16–18. Cogmedia again argues that Meta's proposed construction impermissibly limits the claim terms, which are,

[7] The construction advanced by Meta—expressing a decision—captures the *outcome* of a vote, in which individual voters submit their choices or preferences and by which a decision is ultimately made. And certainly "vote" can be defined to mean "decision by a majority," Dkt. 79-12 at 4, "the ballot," Dkt. 79-10 at 4, or "votes collectively," *id.* But the record here makes clear that the "vote" contemplated is that of an individual user who is expressing their reaction to or preference regarding a given object. Read in the context of the patent, a construction that focuses on a "decision" is too limiting a conception of "vote."

themselves, clear, and that the specification is expressly non-limiting. Dkt. 76 at 15–17; *see also* Dkt. 81 at 11–15.

The Court finds Cogmedia's arguments persuasive. The claim language does not mandate that the copy or replicate function generate a "duplicate." *See* '562 Patent, Claim 1 ("[A] replicate function, by which each user having access to the card in a first collection of cards can cause the card to be replicated in a second collection of cards."); '371 Patent, Claims 1, 15 ("[A] copy function, by which users having access to the card copy function in a first collection of cards of a first user can cause the card to appear in a second collection of cards of a second user."); '141 Patent, Claims 1, 17 ("[A] copy function, by which users having access to the card copy function in a first collection of cards can cause the card to appear in a second collection of cards.").

Nor does the specification suggest that "copy" or "replicate" has only the specific meaning that Meta proposes. *See, e.g.*, '371 Patent at 12:52–58 ("Users 108 *may also copy* IOs 320 from the News View 305, the database view 310 or the exchange view 315. Furthermore, a user 108 *can copy* IOs 320 from the Workspace View 300 to the computer desktop or file system (and vice versa) *thus converting IOs 320 into regular computer files*. This functionality has a variety of applications." (emphases added)); *id.* at 14:28–34 ("Users 108 are able to copy IOs 320 between the Workspace View 300 and the News Views 305. IOs 320 copied from the News View 305 to the Workspace View 300 *may be static and not change in content, or such IOs 320 may dynamically adapt to modifications in content* so that as the information source associated with an IO 320 produces new information." (emphasis added)); *id.* at 16:10–15 ("Users 108 can take 'ownership' over IOs 320 *copied* from their exchange views 315 and these IOs 320 are now modifiable by the user 108. *In one configuration*, when a user takes ownership of an IO 320, the IO 320 *is no longer synchronized* with a counterpart IO on the IO author's Workspace View."

(emphases added)). And, as noted above, "[u]sually [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp.*, 90 F.3d at 1582). Put simply, Meta's "proposed construction would unjustifiably narrow the term's broad scope, which was not explicitly limited or redefined by the specification." *Finjan Software*, No. 06-cv-369, Dkt. 142 at n.1.

The prosecution history is likewise unpersuasive. Meta argues that the Examiner expressly distinguished between "sharing" generally and "sharing" a "copy" during prosecution of the predecessor patent of the Patents-in-Suit, the '090 Patent. Dkt. 78 at 17 (citing Dkts. 79-13, 79-14). However, the Examiner stated, in relevant part:

> Although Nickerson further describes sharing information objects, files or folder among the computing device users. Nickerson does not clearly disclose that the sharing mechanism is via a **move** command (as recited in claims 9), a **copy** command (as recited in claims 8 and 11), and a **send** command (as recited in claim 12).
>
> Rosenblatt, on the other hand discloses information sharing mechanism via a **move command** (see paragraphs 0004, 0045, 0045, and 0059), a **copy command** (see paragraphs 0036, 0043, and 0500), **and a send command** (see paragraphs 0023, 0026, and 0029).

Dkt. 79-13 at 4 (emphases in original). The Court is persuaded that, as Cogmedia contends, "the Examiner was not distinguishing between sharing via access versus sharing via copying." Dkt. 81 at 14. And, regardless, courts must "not rely on the prosecution history to construe the meaning of the claim term to be narrower than it would otherwise be unless a patentee limited or surrendered claim scope through a clear and unmistakable disavowal." *3M Innovative Props. Co.*, 725 F.3d at 1322. Meta does not argue that disavowal applies to this or any of the terms in dispute. *See* Dkt. 82 at 7; *see generally* Dkt. 77. It is clear from the intrinsic record, then, that the terms do not have the limited meaning proposed by Meta. Therefore, as discussed above, "there is no need here to

consult the extrinsic evidence, which cannot change the construction compelled by the intrinsic evidence." *St Case1tech*, 2026 WL 456602, at *4.

Further, where, as here, both parties agree that the plain and ordinary meaning governs, and the Court has rejected Meta's narrower construction, the Court need not construe the terms. *See Finjan, Inc.*, 626 F.3d at 1207. "[W]hile it is undoubtedly the role of the court to construe the claims of a patent, it need not adopt a construction that is different from the words of the patent itself. As noted, the Court is not required to provide additional language construing a claim if its ordinary meaning can be readily understood by a layperson and adopting it would resolve the parties' dispute concerning interpretation." *In re Body Sci.*, 2014 WL 5313861, at *10. Accordingly, the Court adopts the plain and ordinary meaning of the terms "copy function" and "replicate function."

**4. <u>"send command"</u>**

| **Cogmedia's Proposal** | **Meta's Proposal** | **The Court's Construction** |
|---|---|---|
| plain and ordinary meaning; no construction necessary | plain and ordinary meaning, which is "transmit command" | plain and ordinary meaning; no construction necessary |

As to "send command," the parties reassert many of the same arguments advanced above concerning "replicate function" and "copy function." *See supra* Section III.B.3. Meta asserts that "send" means to "transmit," rather than to simply share access, Dkt. 77 at 16–18; Dkt. 82 at 18–19, while Cogmedia argues that Meta's construction impermissibly limits the term, which uses plain, non-technical words and carries the plain and ordinary meaning, Dkt. 78 at 17–19; Dkt. 81 at 15–16.

The language of the claims—*see, e.g.*, '371 Patent, Claim 7 ("[A] send command . . . entered by the first user, causing the selected card to be sent to the second user, so that the selected card . . . is made available to the second user to be included in the collection of the second

user.")—does not specify *how* the card must be "made available . . . to be included in the collection of the second user"; that is, whether it must be transmitted, shared, or otherwise made available. In addition, the specification uses "send" consistent with the plain and ordinary meaning, not limited to transmission. *See, e.g.*, *id.* at 24:52–55 ("An IO can simply be dragged and dropped onto a user icon which subsequently sends a copy of this IO to the intended recipient." (emphasis added)); *id.* at 17:52–63 ("There are various ways in which IOs [information objects] can be exchanged between the IVs [information views] of the same and of different users such as: by copying IOs from the personal IV of another user (Users can make their personal IVs accessible to other users. An IV can be Shared 510 (read/write), Visible 512 (read) or Private 514); *by sending* IOs to a particular user or group of users through the integrated instant messaging system or a commercial instant messaging system; *by sending* IOs to a particular user or group of users through email." (emphases added)). And nothing in the prosecution history of the '090 Patent so limits the claim terms. *See supra* Section III.B.3 (quoting Dkt. 79-13 at 4).

Accordingly, for substantially similar reasons to those set out above with respect to "copy function" and "replicate function," the Court adopts the plain and ordinary meaning of the term "send command."

### 5. <u>"instant messaging function"</u>

| Cogmedia's Proposal | Meta's Proposal | The Court's Construction |
|---|---|---|
| plain and ordinary meaning; no construction necessary | plain and ordinary meaning, which is "realtime communication function" | "function which allows for the instantaneous transmission of computer based or electronic communications" |

Meta argues that both the intrinsic and extrinsic evidence confirm that the plain and ordinary meaning, "realtime communication function," applies and that the claim term excludes commenting. Dkt. 77 at 19–21; *see also* Dkt. 82 at 19–21; Dkt. 91. Cogmedia counters that no

construction is necessary, but that if the Court is inclined to construe the term, it should adopt the construction "immediate computer-based or electronic communication function." Dkt. 88; *see* Dkt. 76 at 19–20; *see also* Dkt. 81 at 16–18.

The intrinsic record plainly undermines Meta's argument that "instant messaging function" and "comment function" are entirely distinct in scope. The language of one claim reads:

> [A]n instant messaging function, by which users having access to the card can exchange author- and time-stamped messages relating to the information object, *such messages being associated with the information object* and accessible to users who view the information object.

'562 Patent, Claim 1 (emphasis added).[8] This language squarely contradicts Meta's argument that "association with an object is a key aspect of a comment."[9] Dkt. 77 at 21. And just because the specification lists instant messaging and commenting separately, *see, e.g.*, '371 Patent at 16:17–18; *id.* at 20:24–26, does not mean that there is no overlap in function. Indeed, the provisional application to which the Patents-in-Suit claim priority states that "[t]he comment functionality is likely to eliminate the need for the Instant Messaging tool," Dkt. 79-17 at 116, which suggests that the comment function is not entirely distinct from at least one form of instant messaging, *see* '371 Patent at 5:66–6:3 ("[T]he: instant messaging system includes communication media such as

[8] The parties also list Claim 9 of the '141 Patent and Claims 9 and 24 of '371 Patent under "instant messaging function" in their joint claim construction statement. Dkt. 76. The Court notes, however, that in those two patents, the term used in the relevant claims is "instant messaging *system*." *See* '141 Patent, Claim 9 ("A method according to claim 1, further comprising: on a user-entered command, causing a card to be shared with another user via an instant message sent through an integrated *instant messaging system* as a result of graphical selection by a first user." (emphasis added)); '371 Patent, Claim 9 ("A method according to claim 1, further comprising: on a user-entered command, causing a card to be shared with another user via an instant message sent through an integrated *instant messaging system* as a result of graphical selection by a first user." (emphasis added)); '371 Patent, Claim 24 ("A method according to claim 15, further comprising: on a user-entered command, causing a card to be shared with another user via an instant message sent through an integrated *instant messaging system* as a result of graphical selection by a first user." (emphasis added)).

[9] Certainly, comments are *also* associated with objects. *See, e.g.*, '371 Patent, Claims 1 (describing "comments being associated with the information object represented by the card"). But that does not support the line Meta seeks to draw between the terms.

Instant Messaging System, email and SMS messaging, text messaging and other forms of real-time communication between participants.”).

Though the Court finds Meta’s arguments unpersuasive, the Court must nevertheless construe the term to resolve the parties’ dispute as to scope. *See O2 Micro*, 521 F.3d at 1360. In light of the claim language and specification, which indicate that the meaning of the claim term is broader than the plain and ordinary meaning would otherwise suggest,[10] the Court adopts the following construction: “function which allows for the instantaneous transmission of computer-based or electronic communications.”

**6. <u>“comment function”</u>**

| Cogmedia’s Proposal | Meta’s Proposal | The Court’s Construction |
|---|---|---|
| plain and ordinary meaning; no construction necessary | plain and ordinary meaning, which is “function that allows a user to remark or annotate” | plain and ordinary meaning; no construction necessary |

Cogmedia argues that “‘comment function’ is a non-technical term used in its common parlance, with a clear description of the term already present in the claims as written,” and that Meta’s proposed construction is unsupported by the intrinsic record. Dkt. 76 at 20–21; *see also* Dkt. 81 at 19–20. Meta, as above, attempts to construe “comment function” to distinguish it from “instant messaging function”:

> The evidence confirms that the plain and ordinary meaning of “comment function” is “function that allows a user to remark or annotate.” In contrast to “instant messaging,” which delivers communications to another user, “comments” are remarks or annotations that are attributed to an object.

[10] The dictionaries to which Meta cites, for example, define “instant messaging” as “[a] service that alerts users when friends or colleagues are on line and allows them to communicate with each other in real time through private online chat areas,” Dkt. 79-15 at 4, and “a means or system for transmitting electronic messages instantly,” Dkt. 79-16 at 4.

Dkt. 77 at 22 (citing Dkt. 78 ¶¶ 54–59). As explained above, the Court is unpersuaded by this line-drawing exercise, which is undermined by the language of the claims themselves.[11] *Compare* ’562 Patent, Claim 1 (“such [instant] messages being associated with the information object”), *with* ’371 Patent, Claim 1 (“such comments being associated with the information object represented by the card”). And the only instance of “remark” or “annotate” in the specification is in a non-limiting embodiment that states: “A comment function allows for the addition of comments and annotations.” ’371 Patent at 10:32–33; *see also 3-D Matrix*, 2016 WL 111410, at *2 (“[T]he court must be careful to ‘us[e] the specification [only] to interpret the meaning of a claim’ and not to ‘import[] limitations from the specification into the claim.’” (quoting *Phillips*, 415 F.3d at 1323)).

Here, where “the ordinary meaning of a term can be readily understood by a layperson and adopting it would resolve the parties’ dispute concerning interpretation, there is no requirement that a court provide additional language construing a claim.” *Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, 59 F. Supp. 3d 206, 221–22 (D. Mass. 2014); *see also Summit 6*, 802 F.3d at 1291 (holding that “[b]ecause the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the claim term”); *cf. Sunrise Techs., Inc. v. Cimcon Lighting, Inc.*, 280 F. Supp. 3d 238, 244 (D. Mass. 2017) (“Both proposed constructions add unnecessary language to a readily understandable term. The Court declines to construe the term and will give it its plain and ordinary meaning.”). Accordingly, the Court declines to construe the term and will give it its plain and ordinary meaning.

---

[11] The Court also notes that Meta acknowledged on *inter partes* review that *both* “an instant messaging . . . function” *and* “a comment function would have enhanced user experience with the blurbs by *allowing for real-time, dynamic interaction* between mobile devices.” Dkts. 81-2 to 81-4 (emphasis added).

**7. <u>"user-entered command"</u>**

| Cogmedia's Proposal | Meta's Proposal | The Court's Construction |
|---|---|---|
| plain and ordinary meaning; no construction necessary | plain and ordinary meaning, which is "command entered by a user" | plain and ordinary meaning; no construction necessary |

Cogmedia contends that the plain and ordinary meaning governs, and that no construction of "user-entered command" is needed. Dkt. 76 at 21–22; *see also* Dkt. 81 at 20–22. Meta argues that "user-entered command" does not encompass commands that are "graphically selected," but ultimately proposes that the claim term be construed as "command entered by a user." Dkt. 77 at 23–24; *see also* Dkt. 82 at 22–25. Even were the Court persuaded by Meta's argument that a "user-entered command" excludes or is distinct from a graphically selected command—the Court is not—Meta entirely fails to capture this distinction by construing "user-entered command" as "command entered by a user." As the Federal Circuit has explained, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *U.S. Surgical Corp.*, 103 F.3d at 1568. Claim construction "is not an obligatory exercise in redundancy." *Id.* Here, where the Court is unpersuaded that the order of the exact same language changes the meaning or scope or provides any clarity as to either, there is no "actual dispute regarding the proper scope of th[is] claim[]." *O2 Micro*, 521 F.3d at 1360. Accordingly, the Court finds that the term has its plain and ordinary meaning and needs no further construction.

**8. <u>"displaying . . . a first view . . . and also displaying . . . a second view"</u>**

| Cogmedia's Proposal | Meta's Proposal | The Court's Construction |
|---|---|---|
| plain and ordinary meaning; no construction necessary | plain and ordinary meaning, which is "displaying a first view and second view at the same time" | plain and ordinary meaning; no construction necessary |

Cogmedia argues that the plain and ordinary meaning of the claim term governs, such that no construction is necessary, Dkt. 76 at 22–23; *see also* Dkt. 81 at 22–24, while Meta contends that the plain and ordinary meaning is "displaying a first view and second view at the same time," Dkt. 77 at 24–26; *see also* Dkt. 82 at 25–26. An illustrative claim reads:

> A method according to claim 1, further comprising: *displaying* in a computing device of a first user, *a first view* of a first set of cards that constitute a first collection of the first user; *and also displaying* in the computing device of the first user, *a second view* of a second set of cards that constitute a collection of a second user.

'371 Patent, Claim 5 (emphases added).[12]

Meta argues that omitting the simultaneity requirement reads the "also" out of the claim language. *See* Dkt. 77 at 24 ("The intrinsic evidence makes clear that when a claim recites the term 'displaying' alone multiple times, the displays do not have to be simultaneous. In contrast, when a claim includes the term 'also displaying' these displays occur at the same time."). Cogmedia counters that "also" need not indicate simultaneous views, but could instead indicate the ability to display multiple different views, as illustrated by the preferred embodiment depicted in Figure 7, which discloses multiple "Workspace View" tabs and a "News View" tab. Dkt. 81 at 23 (citing '371 Patent, Fig. 7).

---

[12] Claims 5 and 20 of the '371 Patent include the word "and" after the semicolon, while Claim 5 of the '141 Patent does not. The claim language is otherwise substantially identical.




*FIG. 7*

Meta also argues, based on its expert declaration, that the claimed method must display the two views at the same time to support the drag and drop embodiment disclosed. Dkt. 77 at 26 (citing Dkt. 78 ¶ 66). Cogmedia emphasizes in response that "[a]s the Federal Circuit has repeatedly instructed, there is no requirement that all claims cover all embodiments." Dkt. 81 at 24 (citing *SIMO Holdings, Inc. v. H.K. uCloudlink Network Tech., Ltd.*, 983 F.3d 1367, 1378–79 (Fed. Cir. 2021); *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010)).

The Court is not persuaded by either of Meta's arguments. Ultimately, as explained above, a Court engaged in "claim construction must not import limitations from the specification into the claims." *Douglas Dynamics, LLC*, 717 F.3d at 1342. And here, Meta's proposed construction "add[s] unnecessary language to a readily understandable term." *Sunrise Techs*, 280 F. Supp. 3d at 244; *see also In re Body Sci.*, 2014 WL 5313861, at *9 ("[T]he prudent course is to adopt the

plain and ordinary meanings of the terms" when "[t]he words of the patent, as chosen by its drafter, can be readily comprehended by a layperson, and their adoption would resolve the parties' dispute."); *Finjan Software*, No. 06-cv-369, Dkt. 142 at n.1 ("[T]he defendant's proposed construction would unjustifiably narrow the term's broad scope, which was not explicitly limited or redefined by the specification."). Accordingly, the Court declines to construe the term and will give it its plain and ordinary meaning.

## IV. Conclusion

The disputed claim terms will be construed for the jury and for all other purposes in this litigation as follows:

1. the term "at least one computer initiates execution of software instructions to perform computer processes" has its plain and ordinary meaning and no construction is necessary;
2. the term "vote function" means "function that expresses a preference, choice, or reaction";
3. the terms "replicate function" and "copy function" have their plain and ordinary meaning and no construction is necessary;
4. the term "send command" has its plain and ordinary meaning and no construction is necessary;
5. the term "instant messaging function" means "function which allows for the instantaneous transmission of computer based or electronic communications";
6. the term "comment function" has its plain and ordinary meaning and no construction is necessary;
7. the term "user-entered command" has its plain and ordinary meaning and no construction is necessary; and

8. the term “displaying . . . a first view . . . and also displaying . . . a second view” has its plain and ordinary meaning and no construction is necessary.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: August 18, 2026